[No. B148288. Second Dist., Div. Two. Sept. 9, 2002.]

IRV RUBIN et al., Plaintiffs and Respondents, v.
CITY OF BURBANK, Defendant and Appellant.

1196

**COUNSEL**

Dennis A. Barlow, City Attorney, and Juli C. Scott, Chief Assistant City Attorney, for Defendant and Appellant.

American Center for Law and Justice, John L. Gordon, Stuart J. Roth, David A. Cortman and Gregory N. Bryl for Mayor Margaret Clark, Zane Han,

Gary Clark, Joe Velasquez and Ricardo Quevedo as Amici Curiae on behalf of Defendant and Appellant.

Richards, Watson & Gershon, T. Peter Pierce, Amy Greyson and Carrie H. Ahn for 34 California Cities as Amici Curiae on behalf of Defendant and Appellant.

Roger Jon Diamond for Plaintiffs and Respondents.

Edward Tabash for Council for Secular Humanism as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**DOI TODD, J.**—Objecting to an invocation given at a Burbank City Council meeting which ended with an expression of gratitude and love "in the name of Jesus Christ," plaintiffs sought and were granted injunctive and declaratory relief against the city. The trial court ruled that the inclusion of "sectarian prayer" in city council meetings violated the establishment clause of the United States Constitution and enjoined the city from allowing sectarian prayer at city council meetings. The trial court also ordered the city to "advise anyone conducting a prayer as part of the city council meeting that sectarian prayers are not permitted." The city has appealed and contends the judgment is "contrary to a firmly established body of constitutional jurisprudence that holds that the practice of legislative invocations which do not proselytize, promote or disparage any single religion" do not violate the establishment clause of the First Amendment. The city further contends that the court order amounts to unconstitutional censorship and viewpoint discrimination.

Because we conclude the invocation violated the establishment clause of the First Amendment of the United States Constitution under *Marsh v. Chambers* (1983) 463 U.S. 783 [103 S.Ct. 3330, 77 L.Ed.2d 1019], and the court's order did not constitute censorship or viewpoint discrimination under the free speech and exercise clauses, we affirm the judgment of the trial court.

### FACTUAL BACKGROUND

The facts are not disputed. Since 1953 the City of Burbank has had a practice of beginning each city council meeting with an invocation. The invocation is usually given by a member of the Burbank Ministerial Association (BMA), a nondenominational organization of clergy and representatives of other organizations, such as the YMCA, whose members meet for

the purpose of fellowship among the religious leaders of the community. BMA is not entirely Christian, but there are, for example, no Moslem, Buddhist, Hindu or Bahai members in the group.

It was the practice of the BMA to circulate a sign-up sheet among its members for volunteers to give the council invocation. The list of volunteers was provided to the city clerk who placed the name of a volunteer on the agenda. Neither the city council nor the city clerk had any input in determining the subject matter or content of the invocation. Although the members of the BMA agreed among themselves that they would be respectful of their members' various and diverse beliefs, they imposed no restrictions on the content of the invocation.

Plaintiff Irv Rubin, who is of the Jewish faith, was present at the city council meeting on November 23, 1999, to give his opinion on a proposed plan for expansion of the Burbank Airport. A member of BMA, who was a minister of the Church of Jesus Christ of Latter Day Saints, gave the invocation which opened the meeting. The invocation concluded as follows: "We are grateful heavenly Father for all that thou has poured out on us and we express our gratitude and our love in the name of Jesus Christ. Amen."[1]

Plaintiff Roberto Alejandro Gandara, who was raised as a Catholic, was present at an earlier city council meeting at which an invocation was given in which Jesus Christ had not been mentioned.

Rubin and Gandara filed suit for declaratory and injunctive relief, challenging the practice of the city to begin the city council meetings with religious prayers invoking the name of Jesus Christ. After trial, the court found the prayer recited on November 23, 1999, was "sectarian" and violated the establishment clause of the First Amendment to the United States Constitution. The court permanently enjoined the city from "knowingly and intentionally allowing sectarian prayer at City Council meetings." The city was ordered to "advise anyone conducting a prayer as part of the City Council meeting that sectarian prayers are not permitted."

The city timely appealed the judgment.

---

[1] The entire text of the invocation was as follows: "Our Father in Heaven, we are grateful to assemble this evening in the capacity of the City Council meeting. We wish to thank thee and express our gratitude for the blessings that we receive each day. We especially are mindful of this week and the Thanksgiving Day to come on which people all over our nation will be expressing gratitude and love unto thee for thy bounteous blessings. [¶] We feel privileged to be part of this community. We are grateful for those who have stepped forward and have been elected to lead this community. Will thou bless them and give them insight and wisdom and those of the city staff who assist and direct the affairs of the city. [¶] Heavenly Father we are grateful for the youth of this community for they are the future and we ask a blessing upon those who teach and lead the youth that they may inspire them to be their best. [¶] We are grateful heavenly Father for all that thou has poured out on us and we express our gratitude and our love in the name of Jesus Christ. Amen."

CONTENTIONS ON APPEAL

The city contends that the trial court erred, asserting (1) pursuant to *Marsh v. Chambers, supra*, 463 U.S. 783, legislative invocations do not violate the establishment clause, and the content of legislative prayer is not to be scrutinized where it is not used to proselytize, advance or disparage any one religion; (2) the rule of *Marsh* has not been diluted or abrogated by other establishment clause cases; and (3) the regulation of the content of prayer is impermissible viewpoint discrimination.

Three amicus curiae briefs have been filed. Margaret Clark et al., representing a mayor, clergy, and other private citizens who reside in cities within the jurisdiction of this court, and 34 California cities have filed amicus curiae briefs in support of the City of Burbank.[2] The Council for Secular Humanism, a nonprofit organization promoting the rights of atheists, has filed an amicus curiae brief in support of respondents Rubin and Gandara.[3]

DISCUSSION

*Standard of appellate review.*

We are presented with constitutional issues, which we review de novo. (*Berry v. City of Santa Barbara* (1995) 40 Cal.App.4th 1075, 1082 [47 Cal.Rptr.2d 661].) We must decide whether the orders of the trial court violate the First Amendment to the United States Constitution, independent of the trial court's ruling or reasoning. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10].)

*Legislative invocations do not violate per se the establishment clause.*

Both sides agree that this case is governed by *Marsh v. Chambers, supra*, 463 U.S. 783, the only United States Supreme Court case that has decided the issue of legislative prayer. The city urges that the judgment of the trial court is an unconstitutional extension of *Marsh*. Respondents argue that the trial court correctly found the invocation unconstitutional.[4]

The issue presented in *Marsh*, as stated by Chief Justice Burger writing on behalf of the majority, was "whether the Nebraska Legislature's practice of

---

[2]Amici curiae in support of the city express concern about the effect the trial court's decision will have on their own cities' practice of prayers at council meetings, and that they too will be forced to end the practice of allowing "sectarian" prayers at their council meetings.

[3]The Council for Secular Humanism takes the position that no branch of government should favor religion over nonbelief.

[4]Respondents, while otherwise taking the position that *Marsh* should be overruled, concede that for the purposes of this case *Marsh* is controlling.

opening each legislative day with a prayer by a chaplain paid by the State violates the Establishment Clause of the First Amendment." (*Marsh v. Chambers, supra,* 463 U.S. at p. 784 [103 S.Ct. at p. 3332].) In *Marsh,* a member of the Nebraska Legislature sought to enjoin this practice claiming that it violated the establishment clause. The district court "held that the Establishment Clause was not breached by the prayers, but was violated by paying the chaplain from public funds." (*Id.* at p. 785 [103 S.Ct. at p. 3333].) On appeal, the Eighth Circuit Court of Appeals applied the three-part test established by the court in *Lemon v. Kurtzman* (1971) 403 U.S. 602 [91 S.Ct. 2105, 29 L.Ed.2d 745]. The *Lemon* test set forth a standard for evaluating statutory violations of the establishment clause finding no violation if the following were proven: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . ; finally, the statute must not foster 'an excessive government entanglement with religion.' " (*Id.* at pp. 612-613 [91 S.Ct. at p. 2111], citations omitted.)[5] The Eighth Circuit held that the Nebraska policy violated all three elements of the test, and prohibited the state from continuing its established practice. Certiorari was granted by the Supreme Court.

After a review of the historical precedent of prayer in the public legislative context, the Supreme Court found that such prayer was "deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom." (*Marsh v. Chambers, supra,* 463 U.S. at p. 786 [103 S.Ct. at p. 3333].) The court noted, "On September 25, 1789, three days after Congress authorized the appointment of paid chaplains, final agreement was reached on the language of the Bill of Rights . . . . Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." (*Id.* at p. 788 [103 S.Ct. at p. 3334].)

The majority in *Marsh* did not evaluate Nebraska's prayer tradition under the *Lemon* test. Instead, as Justice Brennan noted in dissent, the court "carv[ed] out an exception to the Establishment Clause rather than reshaping Establishment Clause doctrine to accommodate legislative prayer." (*Marsh v. Chambers, supra,* 463 U.S. at p. 796 [103 S.Ct. at p. 3338] (dis. opn. of

---

[5]For application of this standard, see, e.g., *Committee for Public Education v. Regan* (1980) 444 U.S. 646, 653 [100 S.Ct. 840, 846, 63 L.Ed.2d 94]; *Committee for Public Education v. Nyquist* (1973) 413 U.S. 756, 772-773 [93 S.Ct. 2955, 2965-2966, 37 L.Ed.2d 948]; *Hunt v. McNair* (1973) 413 U.S. 734, 741 [93 S.Ct. 2868, 2873, 37 L.Ed.2d 923].

Brennan, J.).) The majority concluded that the unique history of legislative prayer, which had been established by the members of the First Congress and practiced for over two centuries, evidenced the lack of threat to the establishment clause from legislative prayer: "We conclude that legislative prayer presents no more potential for establishment than the provision of school transportation [citation], beneficial grants for higher education [citation], or tax exemptions for religious organizations [citation]." (*Marsh, supra,* 463 U.S. at pp. 790-791 [103 S.Ct. at p. 3336].)

In reviewing the specific prayer in question, the court in *Marsh* found that its characteristics, that a Presbyterian clergyman had been selected to give the invocation for 16 years, that the chaplain was paid at public expense, and that the prayers were in the Judeo-Christian tradition, did not invalidate the practice. (*Marsh v. Chambers, supra,* 463 U.S. at p. 793 [103 S.Ct. at pp. 3336-3337].) But the court specifically noted in the margin that "[a]lthough some of [the] earlier prayers were often explicitly Christian, [the minister] removed all references to Christ after a 1980 complaint from a Jewish legislator." (*Id.* at p. 793, fn. 14 [103 S.Ct. at p. 3337].)

Finally, the court set forth what has since been characterized as the *Marsh* test: "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer." (*Marsh v. Chambers, supra,* 463 U.S. at pp. 794-795 [103 S.Ct. at pp. 3338-3339].)

*The trial court's review was not an unconstitutional extension of Marsh.*

■ The city, in defending its practice of opening the city council meetings with prayer, contends the trial court misapplied the *Marsh* test and created its own legal standard "which has no precedential base" and is "contrary to established law." The city asserts the invocations did not serve the purpose of proselytizing, advancing or disparaging any one religion and therefore did not violate the establishment clause. Based on that view, the city argues the trial court violated the explicit holding in *Marsh* when it evaluated and parsed the content of the prayer given as the council's invocation on November 23, 1999, improperly focusing on the content of the very last sentence of the prayer that referred to "Jesus Christ" and basing its determination that the prayer was sectarian on that reference alone.

The city and amici curiae in support of the city's position contend that under *Marsh* the appropriate test involves an examination of the proselytizing or disparaging content of the prayer, rather than a determination of the

"sectarian" nature of an individual prayer. They argue that the *Marsh* court's mention in footnote 14 of the removal of all references to Christ in the Nebraska prayer is merely dicta in an anecdotal footnote, and this factor is never substantively addressed in the opinion. Thus, the city argues that the trial court's apparent reliance on footnote 14 was misplaced and that the trial court "created its own legal standard which has no precedential support and is in fact contrary to the law."

Respondents contend that the prayer in *Marsh* survived constitutional scrutiny because any reference to Jesus Christ had been removed and that *Marsh* supports the decision of the trial court here.

Amici curiae Margaret Clark et al. argue that as long as the invocation was not used to advance the Christian faith or disparage other faiths, the prayer passed constitutional muster under *Marsh*.

It cannot reasonably be argued that the prayer here, with a specific reference to Jesus Christ, is on the same constitutional footing as the prayer before the court in *Marsh,* from which all reference to a specific religion had been excised. It was therefore incumbent upon the trial court to determine whether "the prayer opportunity had been exploited to proselytize or advance any one, or to disparage any other, faith or belief." (*Marsh v. Chambers, supra,* 463 U.S. at pp. 794-795 [103 S.Ct. at p. 3338].)

In *Allegheny County v. Greater Pittsburgh ACLU* (1989) 492 U.S. 573 [109 S.Ct. 3086, 106 L.Ed.2d 472], the court considered whether a December holiday display of a crèche in a county courthouse and a menorah outside a city and county building violated the establishment clause. In deciding that question the majority stated that "[w]hatever else the Establishment Clause may mean . . . , it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions). 'The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.' [Citation.]" (*Id.* at p. 605 [109 S.Ct. at p. 3107].) Nor can government appear "to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.' " (*Id.* at p. 594 [109 S.Ct. at p. 3101], quoting from *Lynch v. Donnelly* (1984) 465 U.S. 668, 687 [104 S.Ct. 1355, 1367, 79 L.Ed.2d 604].)

In response to Justice Kennedy's concern about the court's "latent hostility" or "callous indifference" towards religion, Justice Blackmun writing for the majority stated: "On the contrary, the Constitution mandates that the

government remain secular, rather than affiliate itself with religious beliefs or institutions, precisely in order to avoid discrimination among citizens on the basis of their religious faiths. [¶] A secular state, it must be remembered, is not the same as an atheistic or antireligious state. A secular state establishes neither atheism nor religion as its official creed." (*Allegheny County v. Greater Pittsburgh ACLU, supra*, 492 U.S. at p. 610 [109 S.Ct at p. 3110].)

The court in *Allegheny*, differentiating between the secular and religious aspects of the celebration of Christmas, stated: "Celebrating Christmas as a religious, as opposed to a secular, holiday, necessarily entails professing, proclaiming, or believing that Jesus of Nazareth, born in a manger in Bethlehem, is the Christ, the Messiah. If the government celebrates Christmas as a religious holiday (for example, by issuing an official proclamation saying: 'We rejoice in the glory of Christ's birth!'), it means that the government really is declaring Jesus to be the Messiah, a specifically Christian belief. In contrast, confining the government's own celebration of Christmas to the holiday's secular aspects does *not* favor the religious beliefs of non-Christians over those of Christians. Rather, it simply permits the government to acknowledge the holiday without expressing an allegiance to Christian beliefs, an allegiance that would truly favor Christians over non-Christians." (*Allegheny County v. Greater Pittsburgh ACLU, supra*, 492 U.S. at pp. 611-612 [109 S.Ct. at p. 3110].)

The court's discussion of *Marsh* in *Allegheny* reflects that it considered the removal of references to Christ to have been essential to the *Marsh* ruling: "Indeed, in *Marsh* itself, the Court recognized that not even the 'unique' history of legislative prayer [citation] can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief. [Citation.] The legislative prayers involved in *Marsh* did not violate this principle because the particular chaplain had 'removed all references to Christ.' " (*Allegheny County v. Greater Pittsburgh ACLU, supra*, 492 U.S. at p. 603 [109 S.Ct. at p. 3106].)

It is clear that the factual predicate upon which the Supreme Court ruled in *Marsh* was a legislative invocation from which all references to a particular religion have been purposely excised. We therefore agree with respondents that the trial court's decision was correct under *Marsh*.

*The reference to "Jesus Christ" in the invocation violated*
*the establishment clause.*

We review the invocation at issue in light of the foregoing considerations. The expression of gratitude and love "in the name of Jesus Christ" was an

explicit invocation of a particular religious belief. By directing the prayer to "Our Father in Heaven . . . in the name of Jesus Christ" the invocation conveyed the message that the Burbank City Council was a Christian body, and from this it could be inferred that the council was advancing a religious belief.

The city argues that because only about 20 percent of the volunteers providing the legislative prayer mentioned Jesus Christ in the invocation, it is clear that the prayer opportunity was not being exploited to advance or disparage any one faith or belief. This argument promotes a test that unless a certain incidence of unconstitutional prayer is proven, it cannot be established that one religious belief or faith is being proselytized or advanced over another. We disagree. Rather, we interpret *Marsh* to mean that *any* legislative prayer that proselytizes or advances one religious belief or faith, or disparages any other, violates the establishment clause.

We therefore conclude that, in accordance with the holding in *Marsh,* the invocation offered to Jesus Christ violated the establishment clause because it conveyed the message that Christianity was being advanced over other religions. The trial court was correct in its finding.

*The prohibition against "sectarian prayer" is within the mandate of Marsh.*

The city contends that imposing a standard prohibiting "sectarian prayer" is beyond the mandate of *Marsh,* and, indeed, that sectarian prayer in the context of a legislative invocation is constitutionally permitted. The city argues that the trial court's review exceeded the only criteria imposed by *Marsh* to assess whether the "prayer opportunity has been exploited" for the purposes of proselytizing, advancing, or disparaging any one belief or faith. (*Marsh v. Chambers, supra,* 463 U.S. at p. 795 [103 S.Ct. at p. 3338].) We disagree.

As we have discussed, in light of the specific references to the Christian faith in the invocation, as distinguished from the invocation in *Marsh* from which any such reference had been excluded by design, the trial court properly considered whether the prayer opportunity had been exploited for the purpose of proselytizing, advancing or disparaging any one belief or faith. In deciding that it had, the court found the reference to Jesus Christ rendered the prayer "sectarian."

"Sectarian" is defined as relating to or characteristic of a sect.[6] A "sect" is defined as an organized ecclesiastical body, or a religious denomination.[7] The trial court's characterization of the invocation as "sectarian" was merely a definitional determination that the invocation unconstitutionally communicated a preference for one religious faith (or sect) over another. Returning again to the *Marsh* test, in concluding that the prayer was sectarian, the trial court determined that the prayer opportunity had been exploited to advance one faith, Christianity, over another.[8]

*Requiring the council to advise prayer participants that sectarian prayers are not permitted does not amount to unconstitutional censorship or viewpoint discrimination.*

The city contends that by ordering the city to advise those who volunteer to give the council invocation that sectarian prayers are not permitted, the city is placed in the position of censoring the speech of those who seek to address the city council. The city further contends that by "restricting those whose prayer traditions and beliefs require them to pray in the name of Jesus Christ, while allowing others to pray in a manner consistent with their beliefs," the trial court engaged in discrimination based on viewpoint or ideology, in violation of the speaker's right to freedom of speech under the First Amendment. The city relies on *Perry Ed. Assn. v. Perry Local Educators' Assn.* (1983) 460 U.S. 37 [103 S.Ct. 948, 74 L.Ed.2d 794],[9] *Cornelius v. NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788 [105 S.Ct. 3439, 87 L.Ed.2d 567], and *Rosenberger v. Rector and Visitors of Univ. of Va.* (1995) 515 U.S. 819 [115 S.Ct. 2510, 132 L.Ed.2d 700][10] to support its contention.

The city correctly points out that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or

---

[6]Webster's 10th Collegiate Dictionary (2001) page 1053.

[7]Webster's 10th Collegiate Dictionary, *supra*, page 1053.

[8]We interpret "exploit" here to mean to make productive use of for one's own advantage. (Webster's 10th Collegiate Dict., *supra*, p. 409.)

[9]In *Perry*, a divided Supreme Court held that permitting access to teachers' mailboxes and interschool mail to an incumbent teachers union and denying access to a rival union did not amount to viewpoint discrimination, because government can impose reasonable regulations on speech, as long as the limitations are necessary to serve a compelling state interest, are narrowly drawn to achieve that end, and are not an effort to suppress expression merely because public officials oppose the speaker's view. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra*, 460 U.S. at pp. 45-46 [103 S.Ct. at pp. 954-956].)

[10]In *Rosenberger*, a divided Supreme Court held that denial of funding to a student newspaper with a Christian viewpoint, from a university fund created to pay printing costs of student publications, was unconstitutional viewpoint discrimination, in that any benefit to religion would be incidental to the government's provision of services on a religion-neutral basis, and denial of funding would be based on the message being communicated. (*Rosenberger v. Rector and Visitors of Univ. of Va., supra*, 515 U.S. at pp. 829, 843-844 [115 S.Ct. at pp. 2516-2517, 2523-2524].)

perspective of the speaker is the rationale for the restriction." (*Rosenberger v. Rector and Visitors of Univ. of Va.*, *supra*, 515 U.S. at p. 829 [115 S.Ct. at p. 2516].) But this does not create carte blanche for the speaker.

Whether the trial court's order amounted to unconstitutional censorship or viewpoint discrimination depends on the nature of the speech involved and the manner of restriction imposed. The question of whether prayer in the context of student-led, student-initiated invocations before football games at a public school was "private speech" protected by the free speech and free exercise clauses of the First Amendment was answered by the Supreme Court in *Santa Fe Independent School Dist. v. Doe* (2000) 530 U.S. 290 [120 S.Ct. 2266, 147 L.Ed.2d 295]. In concluding that such speech was not "private speech," the court noted that "[t]hese invocations are authorized by a government policy and take place on government property at government-sponsored school-related events." (*Id.* at p. 302 [120 S.Ct. at p. 2275].) "We recognize the important role that public worship plays in many communities, as well as the sincere desire to include public prayer as a part of various occasions so as to mark those occasions' significance. But such religious activity in public schools, as elsewhere, must comport with the First Amendment." (*Id.* at p. 307 [120 S.Ct. at p. 2278].)

As to whether such speech would be perceived as public or private speech, the *Santa Fe* court said: "In cases involving state participation in a religious activity, one of the relevant questions is 'whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as a state endorsement of prayer in public schools.' [Citation.] Regardless of the listener's support for, or objection to, the message, an objective [participant] will unquestionably perceive the inevitable pregame prayer as stamped with her school's seal of approval." (*Santa Fe Independent School Dist. v. Doe*, *supra*, 530 U.S. at p. 308 [120 S.Ct at p. 2278].) The court held that the invocation delivered over the school's public address system, supervised by school faculty, and in accordance with the school policy that explicitly encourages public prayer was not "private speech." (*Id.* at p. 310 [120 S.Ct. at p. 2279].)

The Ninth Circuit Court of Appeals, in *Cole v. Oroville Union High School Dist.* (9th Cir. 2000) 228 F.3d 1092, followed *Santa Fe* and concluded that a public school district's refusal to allow students to deliver sectarian and proselytizing valedictory speeches as part of a graduation ceremony was necessary to avoid violating the establishment clause, and therefore did not violate the speaker's free speech rights. (*Cole*, at p. 1102.) "The invocation would not have been private speech, because the District authorized an invocation as part of the graduation ceremony held on District property. . . ." (*Ibid.*)

In light of the fact that the legislative invocation given at the Burbank City Council meeting took place on government property, was authorized by the long-standing policy of the city council, was part of the official agenda of the council meeting, and was for the purpose of calling for spiritual assistance in the work of the legislative body, we are satisfied that it was not "private speech." As in *Santa Fe* and *Cole*, an objective observer familiar with the city's policy and implementation would likely perceive that the invocation carried the city's seal of approval. As such, those who provide legislative invocations at the Burbank City Council meetings are subject to the requirement that the prayers should comport with the First Amendment.

■ "For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra*, 460 U.S. at p. 45 [103 S.Ct. at p. 955].) "In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (*Id.* at p. 46 [103 S.Ct. at p. 955].)

■ We can think of no more compelling interest than safeguarding the establishment clause of the First Amendment to support the restriction ordered here. ■ As stated in *Lynch v. Donnelly* (1984) 465 U.S. 668 [104 S.Ct. 1355, 79 L.Ed.2d 604], "The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community. Government can run afoul of that prohibition in two principal ways. One is excessive entanglement with religious institutions, which may interfere with the independence of the institutions, give the institutions access to government or governmental powers not fully shared by nonadherents of the religion, and foster the creation of political constituencies defined along religions lines. . . . The second and more direct infringement is government endorsement or disapproval of religion. Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message." (*Id.* at pp. 687-688 [104 S.Ct. at p. 1367] (conc. opn. of O'Connor, J.).)

■ The interest in protecting and safeguarding the fundamental constitutional right to maintain a separation between church and state and to demand neutrality when the interests of religion and government intersect is increasingly more important as our nation becomes more pluralistic. In

ordering that the city not permit sectarian prayer at city council meetings and requiring the city to advise those who participate in conducting prayer at city council meetings of this limitation, the trial court drew the regulation as narrowly as possible. The only restriction being imposed on the prayer is that it not be sectarian, that is, that the invocation not be used to advance one faith or belief over another.[11]

## DISPOSITION

The judgment of the trial court fully comports with *Marsh v. Chambers*, *supra*, 463 U.S. 783, and is affirmed. Respondents are awarded costs of appeal.

Nott, Acting P. J., and Ashmann-Gerst, J., concurred.

A petition for a rehearing was denied October 7, 2002, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 18, 2002. Baxter, J., and Brown, J., were of the opinion that the petition should be granted.

---

[11]Amicus curiae Thirty-Four California Cities presents an argument in their brief that the terms of the trial court's injunction are ambiguous and therefore unenforceable. This issue was not raised by appellant in its opening brief. While we recognize that this court may consider new issues raised by an amicus curiae on appeal (see *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 709-713 [209 Cal.Rptr. 682, 693 P.2d 261]), we decline to do so here.