[No. B204045. Second Dist., Div. Three. Apr. 28, 2009.]

SP STAR ENTERPRISES, INC., Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant and Respondent.

COUNSEL

Wellman & Warren, Scott W. Wellman and Stuart Miller for Plaintiff and Appellant.

Rockard J. Delgadillo, City Attorney, Jeri L. Burge, Assistant City Attorney, Tayo A. Popoola and Steven N. Blau, Deputy City Attorneys, for Defendant and Respondent.

OPINION

**KLEIN, P. J.**—Appellant SP Star Enterprises, Inc. (Star), holds a certificate of occupancy from the City of Los Angeles (the City) permitting Star to operate an adult club featuring nude entertainment in a two-story, 7,000-square-foot converted warehouse/manufacturing facility zoned M3-1 on Ducommun Street north of Little Tokyo. Star also holds a franchise to operate a Penthouse-branded adult cabaret. This case involves Star's application for a conditional use permit for the sale and onsite consumption of alcohol at the club.

The City's zoning administrator granted Star's application for one year. The Los Angeles Hompa Hongwanji Buddhist Temple (the Temple) and the Fukui Mortuary appealed the approval to the City's central area planning commission (APC). The appeal was supported by the Los Angeles Police Department, two city council members, the Central City East Association and numerous private citizens who argued the proposed use is not compatible with the religious and community uses in the area or the redevelopment of the area north of Little Tokyo.

Star responded its upscale business would improve tourism in the area as Penthouse cabarets had in other cities and would have no adverse impact on the neighborhood. Further, Star already was licensed to offer fully nude dancing, and issuance of the conditional use permit would trigger Department of Alcoholic Beverage Control (ABC) regulations which limit adult entertainment to topless dancing on stages at least six feet from the nearest patron.

The APC conducted a public hearing at which it upheld the appeal, resulting in the denial of the conditional use permit. Star then sought a writ of mandate. The trial court denied Star's writ petition, indicating it would uphold the APC's ruling whether it applied a substantial evidence or a de novo standard of review. This appeal followed.

The thrust of Star's attack on the APC's ruling and the trial court's denial of its writ petition is that Star is entitled to preferential treatment because it engages in a disfavored form of protected expression. Thus, the standards under which the APC operated must be strictly scrutinized to avoid giving the APC unbridled discretion to regulate speech. Star also contends the APC's findings were a pretext for discriminating against disfavored speech and were not supported by substantial evidence.

We conclude the case does not involve free speech but the right to sell alcohol, which is not a protected activity and does not involve a fundamental vested right. (*Yu v. Alcoholic Bev. etc. Appeals Bd.* (1992) 3 Cal.App.4th 286, 297 [4 Cal.Rptr.2d 280].) Thus, the standards under which the APC upheld the appeal need not reflect the " ' "precision of regulation" ' " required when a municipality regulates protected activity. (*Burton v. Municipal Court* (1968) 68 Cal.2d 684, 691 [68 Cal.Rptr. 721, 441 P.2d 281].) Rather, because the standards applied by the APC are not vague or arbitrary and the APC's decision finds substantial support in the record, we affirm the trial court's order denying Star's writ petition.

## FACTS AND PROCEDURAL BACKGROUND

1. *Star is granted a conditional use permit; the Temple and Fukui Mortuary appeal.*

Star initially obtained a building certificate from the City to convert a two-story warehouse/manufacturing facility into a gentleman's club with seating for 177 patrons, 133 parking spaces, and hours of operation from 11:00 a.m. to 2:00 a.m. daily. The City thereafter granted Star a certificate of occupancy permitting it to offer nude entertainment.

Star then sought a conditional use permit for the sale and consumption of a full line of alcoholic beverages with live entertainment consisting of clothed and topless dancing. The application disclosed the club would have no kitchen and would have happy hour from 4:00 to 7:00 p.m. daily.

The zoning administrator conducted a public hearing and thereafter granted Star's application for a conditional use permit for one year. The approval letter stated the site is a corner parcel with 150 feet of frontage on the north side of Ducommun Street and approximately 138 feet along Vignes Street. The property is improved with a warehouse building with rooftop and interior parking accessed via Commercial Street. Surrounding properties are charac-

terized by commercial/industrial buildings occupied by perishable food cold storage, food processing operations, and a City maintenance yard.

The Temple and the Fukui Mortuary appealed the approval to the APC, which conducted a public hearing on the matter.

### 2. The public hearing before the APC.

#### a. The zoning administrator's explanation of the approval.

Zoning administrator Albert Landini approved Star's application because ABC guidelines for this census tract permit one onsite license for the sale of alcohol and one offsite license and, at the current time, there are no licenses. The area had a low crime rate and, although it had been claimed there were two artists' lofts nearby, no residential properties had been identified and residential use in the area clearly was in the minority. Landini noted Star voluntarily had agreed to conditions on the signage of the building, the site has a large amount of parking and construction of the club has been completed. Landini noted the permit had a life of one year and Star had accepted this condition based on its substantial belief in the nature of its business.

#### b. Position of the proponents of the appeal.

Gerald Fukui, the fifth generation operator of the Fukui Mortuary on East Temple Street, testified the mortuary has been serving the Japanese-American community since 1918. They have a chapel which accommodates 150 people and is used for funerals and memorial services involving all faiths and religions. The mortuary conducts more than 500 services per year, and many services continue into the night as is the Japanese-American custom. The mortuary is approximately three blocks from the site of the proposed permit. The sale of alcoholic beverages in such proximity to the mortuary would be disruptive, dangerous and contrary to the environment of grieving family and friends. Fukui indicated there already was a problem with Little Pedro's, a bar directly across the street from the Temple at First and Vignes Streets. Loud, boisterous patrons of Little Pedro's park and urinate in the mortuary's parking lot and act disrespectfully when passing the entrance to the chapel. Fukui noted the mortuary will be between the new cabaret and Little Pedro's.

On behalf of the Temple, Eric Kurimura testified the permit will create an unsafe environment for families congregating at the Temple. Kurimura feared disruption of numerous religious services and youth programs. Also, the

increased sale of alcohol in the area would be adverse to the changing nature of the community. The Temple operates a daycare center from 8:00 a.m. to 6:00 p.m. five days a week. The Temple also has funeral services, memorial services and weddings, most of which take place in the evening. The permit did not require Star to sell food and the Temple was concerned that intoxicated people leaving the cabaret would engage in boisterous conduct.

A member of the Temple noted the cabaret would be open when the children who attended the daycare center took monthly field trips and were dropped off on Vignes Street between Ducommun and Temple Streets. These field trips would occur during the hours of operation of the cabaret. Another member of the Temple expressed fear of cars racing on Vignes Street on Friday night when the Temple had approximately 100 children involved in its scout program.

Brandy Chappell, planning deputy for Councilmember Jan Perry of the ninth council district, expressed concern that issuance of the permit would result in an increase in drunk driving in the neighboring residential communities. Chappell noted problems had occurred at the Grand Avenue club and the Stock Exchange club and concluded the conditional use permit was not in the best interests of Little Tokyo or the Arts District. Chappell noted the Little Tokyo community had opposed a conditional use permit for the Neptune project which was at Third and Alameda Streets and was not a cabaret. The opposition was based solely on alcohol use.

Jessica Wethington McLean, the planning director for Councilmember Jose Huizar of council district 14, testified the area is undergoing revitalization. The area had a "tremendous" amount of crime five to seven years earlier but it was "cleaned up, because we have a vision for this area." McLean noted a new business improvement district (BID) was scheduled to open in January and the City wanted to mix residential and light industrial uses in the area. The Fukui Mortuary is 18 feet beyond the 500-foot notification limit and the Temple provides religious services to the community, which is "burgeoning." McLean indicated an alcohol permit was not compatible with the council's vision for the area or the long-term plan.

Estella Lopez, executive director of the Central City East Association which represents the interests of 1,500 property owners, supported the appeal on behalf of the residents of the Arts District, property owners and business owners who wished to eliminate nuisance uses. The Arts District was in transition with more residential use anticipated and the proposed use was wrong for this community at this time.

The owner of Heet Sound Products, 150 feet from the proposed use, opposed the application anticipating the club would cause based on increased noise and drunkenness in the evenings and on the weekend.

Los Angeles Police Lieutenant Tom Brosh indicated that based on 28 years of experience, when alcohol is combined with this type of establishment and late hours, it generally leads to "disaster." "And I can guarantee that I'm going to be out there on some Saturday night at 1:00 in the morning handling a murder, because it's just going to happen. That's just the way it is." Brosh predicted the crime rate would increase dramatically just when the area was undergoing a renaissance. Brosh noted a new multistory residential structure was being built at Temple and Alameda Streets, businesses were trying to revitalize the area and there were artists' lofts in the area. Brosh also noted the county jail was a few blocks away and people are released from the jail at all times of the day and night. Brosh predicted an increase in panhandling and crime. Brosh indicated that even if the cabaret provided security inside the club, problems arise when patrons leave.

Los Angeles Police Lieutenant Raymond Garvin testified the club was seven blocks from the skid row area and the contemplated use would attract the element the police are trying to abate under the Safer Cities Initiative.

c. *Opposition to the appeal.*

Counsel for Star indicated Star has invested more than $1 million in the property and Star's licensing agreement with Penthouse required Star to run an upscale club. Also, although the conditional use permit did not require the sale of food, Star's licensing agreement with Penthouse required Star to offer food. Counsel noted that, without a liquor license, the club could offer fully nude dancing. However, with a liquor license, ABC regulations limited the club's entertainment to topless and the performers were required to be on stages six feet from the nearest patron. Counsel noted the building is basically a concrete box which will emit no noise and all parking is on the interior and the roof of the structure. Counsel asserted there would be no need for customers to park on the street or walk in the neighborhood and the business would have security at all times it was open. Also, the funeral home is 518 feet from the site and the Temple is more than 1,000 feet from the site. Thus, both were outside the 500-foot statutory notice range.

d. *Remarks of the commissioners.*

Commissioner Chanchanit Martorell indicated the commission had to consider that the community "is experiencing a total turnaround, a revitaliza-

tion, a [r]enaissance." Martorell stated the community wants to be hospitable to families and noted Lieutenant Brosh had testified, based on his 28 years of experience, that disaster follows if you combine alcohol, testosterone and late hours. Also the cabaret was in close proximity to the county jail and skid row where there is a great deal of drug and alcohol abuse. Martorell indicated the APC's obligation was to see that "this community is given a chance—given an opportunity to turn around." Martorell concluded, "It's just not a compatible use . . . ." "[W]e want to move forward, not backward."

Commissioner Franklin Acevedo indicated difficulty reconciling operation of a cabaret with the community spaces located nearby. Acevedo suggested children at the daycare center might be in danger of injury from a drunk driving incident after lunch.

Commission President Young Kim indicated Star had a right to operate this type of facility at the location. However, Kim did not think the number of alcohol licenses in this census tract was relevant in that other census tracts have an overconcentration of alcohol permits.

e. *The APC's ruling.*

The APC upheld the appeal by a vote of three to one. The APC found the use was not desirable to the public convenience or welfare, was materially detrimental to the character of development of the community and was not in harmony with the objectives of the general plan.

The APC adopted proposed findings of fact as required by the Los Angeles Municipal Code (LAMC).[1] The APC found as follows: "The proposed location will not be desirable to the public convenience or welfare" in that it is "not in accordance with the greater development pattern of the surrounding

---

[1] LAMC section 12.24, subdivision E requires the APC to make the following findings before a conditional use permit may be approved: "[T]he proposed location will be desirable to the public convenience or welfare, is proper in relation to adjacent uses or the development of the community, will not be materially detrimental to the character of development in the immediate neighborhood, and will be in harmony with the various elements and objectives of the General Plan." (LAMC, § 12.24, subd. E.)

LAMC section 12.24, subdivision W.1 requires additional findings by the APC for approval of a conditional use permit to sell alcohol. Specifically, the APC must find: "(1) that the proposed use will not adversely affect the welfare of the pertinent community; [¶] (2) that the granting of the application will not result in an undue concentration of premises for the sale or dispensing for consideration of alcoholic beverages . . . ; and [¶] (3) that the proposed use will not detrimentally affect nearby residentially zoned communities in the area of the City involved, after giving consideration to the distance of the proposed use from residential buildings, churches, schools, hospitals, public playgrounds and other similar uses . . . ." (LAMC, § 12.24, subd. W.1(a).)

community. It is not respectful of what is referred to as sacred space; associated with both the nearby Buddhist temple, and with the mortuary. And it provides a potentially dangerous mixture of the sale of alcoholic beverages and [an] otherwise permitted use of land that, in the opinion of the Los Angeles Police Department, can result in increased crime rates."

"The use will be materially detrimental to the character of development in the immediate neighborhood, because this area is one that is emerging as a unique residential community in the establishment of various artists and resident lofts . . . ."

The APC also noted that, because of the proximity to downtown, this area will be increasingly important as a residential resource and the proposed use of the land would be detrimental to that use.

The APC further found the proposed location will not be in harmony with the various elements and objectives of the general plan. Although the property is zoned for heavy industrial use, it is also located in an increasingly important area that has been recognized by elected officials as one in which there is a significant change in land use, away from manufacturing to housing and artist activities and the proposed future establishment of a BID. The APC found approval of the requested use "will adversely affect the economic welfare of the community because there has been a wholesale outcry from various public and quasi governmental organizations representing business and cultural activities that claim such use in this neighborhood . . . will be detrimental to their long-term goals and objectives of providing a better business environment for the Art[s] District as well as for the Little Tokyo area."

"While the crime statistics are low for this area, and the associated alcohol beverage sales are also nonexistent in the subject census tract, it can be found that the proposed use will result in an undue concentration of premises for the sale or dispensing . . . of alcoholic beverages when the larger surrounding community, including . . . the downtown area, is taken into consideration. [¶] In this larger area, it has been demonstrated by verbal testimony from the Council office and the police department that there are troublesome issues involving the mixture of alcohol and a nightclub, or other cabaret like activities."

In finding the proposed use would detrimentally affect the surrounding community, the APC considered the increasing number of residences in the area. Although these residences are outside the immediate notification radius,

they are nonetheless in close enough proximity that they should be considered as potentially being troubled by the proposed use.

"Further, in reaching a finding of detrimental impact, the [APC] has considered testimony from the police department regarding the effect of the sale of alcoholic beverages in such establishment, and the resulting criminal activity that is potentially likely to appear." The APC also considered the impact "sales of alcoholic beverages might have on school children walking to and from school activities, and using a shuttle bus that stops in close proximity to the subject site."

3. *Star institutes proceedings under Code of Civil Procedure section 1094.5.*

Star sought review of the APC's ruling in the trial court through administrative mandamus pursuant to Code of Civil Procedure section 1094.5. After conducting a hearing, the trial court denied Star's mandamus petition. The trial court found substantial evidence supported the APC's ruling. In so finding, the trial court indicated it would reach the same decision regardless of the standard of review applied. This appeal followed.

## CONTENTIONS

Star contends the APC and the trial court denied Star an economic benefit because Star engaged in a disfavored form of protected expression. Star further contends the standards under which the APC operated gave it unbridled discretion to regulate speech, the APC's rationale for denying the permit was a pretext for discriminating against disfavored speech, denial of the permit on the grounds of future redevelopment endowed the APC with unconstitutional discretion to regulate speech and the APC's findings were not supported by substantial evidence.

## DISCUSSION

1. *Standard of review.*

The exclusive remedy for judicial review of administrative action affecting land use is a proceeding under Code of Civil Procedure section 1094.5. (*Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1211 [30 Cal.Rptr.2d 95]; Code Civ. Proc., § 1094.5, subd. (a).) A trial court's review of an administrative decision is subject to two possible standards depending on the nature of the right involved. (*Mann v. Department of Motor Vehicles* (1999) 76 Cal.App.4th 312, 320 [90 Cal.Rptr.2d 277].)

If the administrative decision involved or substantially affected a "fundamental vested right," the superior court exercises its independent judgment upon the evidence disclosed in a limited trial de novo in which the court must examine the administrative record for errors of law and exercise its independent judgment upon the evidence. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143–144 [93 Cal.Rptr. 234, 481 P.2d 242]; see Code Civ. Proc., § 1094.5, subd. (c).)

Where no fundamental vested right is involved, the trial court's review is limited to examining the administrative record to determine whether the agency's decision and its findings are supported by substantial evidence in light of the whole record. (*Bixby v. Pierno, supra*, 4 Cal.3d at pp. 143–144.)

Regardless of the nature of the right involved or the standard of judicial review applied in the trial court, an appellate court reviewing a trial court's ruling on administrative mandamus applies a substantial evidence standard. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 [85 Cal.Rptr.2d 696, 977 P.2d 693]; *Bixby v. Pierno, supra*, 4 Cal.3d at pp. 143–144.) "If a fundamental vested right was involved and the trial court therefore exercised independent judgment, it is the trial court's judgment that is the subject of appellate court review. [Citations.] On the other hand, if the superior court properly applied substantial evidence review because no fundamental vested right was involved, then the appellate court's function is identical to that of the trial court. It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the evidence and drawing all inferences in support of them. [Citations.]" (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058 [48 Cal.Rptr.3d 563], fn. omitted.)

Under the substantial evidence test, the agency's findings are presumed to be supported by the administrative record and the appellant challenging them has the burden to show they are not. (*JKH Enterprises, Inc. v. Department of Industrial Relations, supra*, 142 Cal.App.4th at p. 1062; *Mann v. Department of Motor Vehicles, supra*, 76 Cal.App.4th at p. 318; *Saad v. City of Berkeley, supra*, 24 Cal.App.4th at p. 1212.) "When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court." (*Pasadena Unified Sch. Dist. v. Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].)

2.  *Star's application for a conditional use permit for the sale and onsite consumption of alcohol does not involve a fundamental vested right.*

Star asserts topless dancing is a recognized form of protected activity. (*J. L. Thomas, Inc. v. County of Los Angeles* (1991) 232 Cal.App.3d 916, 924 [283 Cal.Rptr. 815].) Star argues that because the APC's decision impacts Star's ability to engage in protected activity, the trial court was required to conduct an independent review of the record. (*Rubin v. City of Burbank* (2002) 101 Cal.App.4th 1194, 1195 [124 Cal.Rptr.2d 867]; *Zeitlin v. Arnebergh* (1963) 59 Cal.2d 901, 909 [31 Cal.Rptr. 800, 383 P.2d 152].)

Determination whether a right is fundamental is made on a case-by-case basis. (*Bixby v. Pierno, supra,* 4 Cal.3d at p. 144.) "[A]s a general rule, when a case involves or affects purely economic interests, courts are far less likely to find a right to be of the fundamental vested character. [Citations.]" (*JKH Enterprises, Inc. v. Department of Industrial Relations, supra,* 142 Cal.App.4th at pp. 1060–1061.) Thus, " '[a]dministrative decisions which result in restricting a property owner's return on his property, increasing the cost of doing business, or reducing profits are considered impacts on economic interests, rather than on fundamental vested rights.' (*E.W.A.P., Inc. v. City of Los Angeles* (1997) 56 Cal.App.4th 310, 325, 326–327 [65 Cal.Rptr.2d 325] . . . .)" (*Id.* at p. 1061.)

It is clear that an initial application for a conditional use permit to sell alcohol for onsite consumption does not involve a fundamental vested right or Star's right of free speech. On the contrary, it is generally accepted that "the liquor business is fraught with danger to the community, and may therefore be either entirely prohibited, or permitted under such conditions as are prescribed by the regulatory agency, which has broad power in this respect. [Citations.]" (*Yu v. Alcoholic Bev. etc. Appeals Bd., supra,* 3 Cal.App.4th at p. 296.)

The cases cited by Star, *Rubin* and *Zeitlin,* involve sectarian prayer in city council meetings and whether a book was obscene, respectively. Both of these issues are grounded in constitutional rights. However, the impact of the APC's decision on Star's business was purely economic. Star already has a certificate to operate as an adult club offering nude entertainment. Thus, the matter in issue in this case is not the right to engage in protected activity, but the right to sell alcohol for onsite consumption. As a result, the trial court properly applied the substantial evidence test, rather than the independent

judgment standard. We therefore review the APC's decision and its findings to determine whether they are supported in light of the administrative record.

### 3. *Vague Standards.*

#### a. *Star's arguments.*

Star contends the APC's decision was based on vague standards that gave it unbridled discretion "to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." (*Lakewood v. Plain Dealer Publishing Co.* (1988) 486 U.S. 750, 759 [100 L.Ed.2d 771, 108 S.Ct. 2138].) Star claims the APC's ruling "plainly imposes a financial disincentive only on speech of a particular content." (*Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.* (1991) 502 U.S. 105, 116 [116 L.Ed.2d 476, 112 S.Ct. 501].) Star asserts that because the APC gave Star the option of engaging in protected speech without an alcohol permit or refraining from that speech, the APC was required to base its ruling on "narrow, objective and definite standards . . . ." (*Jersey's All-American Bar v. Wash. Liquor Control* (W.D.Wn. 1999) 55 F.Supp.2d 1131, 1138.)

Star argues that, "[i]n considering the constitutionality of ordinances in the category of that involved here ' "precision of regulation must be the touchstone" ' [citation] and the standards set forth therein must be 'susceptible of objective measurement' . . . ." (*Burton v. Municipal Court, supra,* 68 Cal.2d at p. 691.) Star notes the APC found the "proposed location would not be *desirable* to the public convenience or welfare," "the location is not *proper* in relation to adjacent uses or the development of the community, the use will be *materially detrimental* to the character of the development in the immediate neighborhood," and "the use will not be *in harmony* with the various elements and objectives of the General Plan."

Star contends terms such as "proper," "materially detrimental," "in harmony" and "immediate neighborhood" are unconstitutionally vague and fail to give the applicant a standard it can understand and meet. (*Smith v. County of Los Angeles* (1994) 24 Cal.App.4th 990, 1006–1007 [29 Cal.Rptr.2d 680].) Thus, the standards applied by the APC constitute unconstitutional "administrative censorship in an extreme form." (*Largent v. Texas* (1943) 318 U.S. 418, 422 [87 L.Ed. 873, 63 S.Ct. 667].) Star concludes the denial of the permit was an unconstitutional burden on speech and, in the absence of precise standards, the APC's decision was arbitrary as a matter of law.

#### b. *Speech versus onsite sale and consumption of alcohol.*

The authority cited by Star uniformly involves speech, not onsite sale and consumption of alcohol. (*Lakewood v. Plain Dealer Publishing Co., supra,* 486 U.S. 750 [mayor's absolute authority over annual applications to place news racks on public property amounted to a prior restraint]; *Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd., supra,* 502 U.S. 105 [requirement that proceeds of book sales be turned over to victims imposes a financial disincentive only on speech of a particular content]; *Jersey's All-American Bar v. Wash. Liquor Control, supra,* 55 F.Supp.2d 1131 [permit required before liquor license holder could provide dancing or entertainment]; *Burton v. Municipal Court, supra,* 68 Cal.2d at p. 687 [prohibition of exhibiting motion pictures without a permit if the operation did not " 'comport with the peace, health, safety, convenience, good morals, and general welfare of the public' " or if the applicant is " 'unfit to be trusted with the privileges granted by such permit, or has a bad moral character, intemperate habits or a bad reputation for truth, honesty, or integrity' "]; *Largent v. Texas, supra,* 318 U.S. at p. 419 [ordinance making it unlawful to sell books or merchandise without a permit].)

Here, Star already has a license to engage in protected activity at the Ducommun Street location. Consequently, this case, unlike those cited by Star, involves not speech but the onsite sale and consumption of alcohol. Indeed, even without the conditional use permit, Star is licensed to offer fully nude entertainment. The denial of a conditional use permit for the onsite sale and consumption of alcohol might render Star's activity less profitable. However, this is not a case in which the APC has "decided to regulate health and safety via a license to speak . . . ." (*Jersey's All-American Bar v. Wash. Liquor Control, supra,* 55 F.Supp.2d at p. 1137.)

#### c. *Standard of review applicable to the LAMC provisions at issue.*

Because this case involves the onsite sale and consumption of alcohol, we do not subject the LAMC to the strict level of scrutiny applicable in cases involving freedom of speech. "[T]he rule announced in *Burton* [requiring precision in the standards under which a permit may be issued] applies only to those situations in which the operation of a licensing ordinance impinges upon the exercise of First Amendment activities, rather than ordinary commercial enterprises. [Citation.]" (*Sunset Amusement Co. v. Board of Police Commissioners* (1972) 7 Cal.3d 64, 72 [101 Cal.Rptr. 768, 496 P.2d 840].) Absent an ascertainable effect upon First Amendment activities, the provisions of the LAMC provide an adequate standard to guide the APC's discretion, namely, that it must exercise its power in a reasonable, rather than arbitrary, manner to promote the interest of the public. (7 Cal.3d at p. 72.)

The provisions of the LAMC relating to the issuance of a conditional use permit based on a finding the " 'proposed location will be desirable to the public convenience or welfare and will be in harmony with the various elements and objectives of the Master Plan' " specifically have been upheld against challenges of vagueness. (*Stoddard v. Edelman* (1970) 4 Cal.App.3d 544, 548 [84 Cal.Rptr. 443]; *Case v. City of Los Angeles* (1963) 218 Cal.App.2d 36, 42 [32 Cal.Rptr. 271]; *Wheeler v. Gregg* (1949) 90 Cal.App.2d 348 [203 P.2d 37].)

■ Further, land use ordinances precluding uses detrimental to the " 'general welfare' " are not unconstitutionally vague. (*Novi v. City of Pacifica* (1985) 169 Cal.App.3d 678, 680 [215 Cal.Rptr. 439].) "In fact, a substantial amount of vagueness is permitted in California zoning ordinances: '[I]n California, the most general zoning standards are usually deemed sufficient. "The standard is sufficient if the administrative body is required to make its decision in accord with the general health, safety, and welfare standard." [Citation.]' " (*Id.* at p. 682; see *Higgins v. City of Santa Monica* (1964) 62 Cal.2d 24, 30 [41 Cal.Rptr. 9, 396 P.2d 41].)

In sum, the provisions of the LAMC in issue must be upheld as a reasonable exercise of the City's police power to license and regulate business activities.

### 4. *Personal antipathy.*

Star contends the comments of the commissioners at the hearing reveal an acknowledgement that Star had a First Amendment right to issuance of the permit and the APC improperly voted in favor of the appeal based on personal antipathy or community opposition. Star relies on the comments by the commissioners and the APC's decision that the combination of alcohol and testosterone is a "recipe for disaster." Star notes the statements of the individual commissioners mirror those contained in *Smith v. County of Los Angeles, supra,* 24 Cal.App.4th at page 1007. Star concludes the APC discriminated against it based on the content of its speech.

However, the record does not support Star's claim the commissioners opposed issuance of the conditional use permit based on animosity toward adult entertainment. Rather, the opposition was to the sale and onsite consumption of alcohol and the impact intoxicated individuals would have on the neighborhood, especially the religious services and community activities offered by the Temple and the mortuary. At the hearing, the representative of City Councilmember Jan Perry made it clear the opposition to the proposed use was grounded in the sale and consumption of alcohol, which had been opposed at other locations that did not offer adult entertainment. Thus, the

record reveals the opposition to Star's permit was not based on Star's intent to engage in protected activity. Rather, the opposition centered on Star's onsite sale and consumption of alcohol.

*Smith* is distinguishable. In *Smith*, an application for a conditional use permit for a nude dancing club was denied pursuant to a zoning ordinance that applied only to adult businesses. One of the commissioners in *Smith* went on a "tirade" against adult businesses and indicated "everything possible" would be done "to eliminate them entirely from the county." (*Smith v. County of Los Angeles, supra,* 24 Cal.App.4th at p. 1007.) No similar remarks are found in the present record.

### 5. *Future redevelopment.*

Star next asserts the APC repeatedly stated the proposed use would be inconsistent with unspecified plans for redevelopment of the community that included the Arts District, the proposed BID and the Little Tokyo area. Star notes the APC found there had been a "wholesale outcry from the various public and quasi-governmental organizations representing business and cultural activities claiming that the sale of alcoholic beverages at the subject location will be detrimental to their long-term goals of providing a better business environment for the Art[s] District as well as the Little Tokyo area." Star asserts *Gammoh v. City of Anaheim* (1999) 73 Cal.App.4th 186 [86 Cal.Rptr.2d 194] held a municipality cannot exclude an adult cabaret on the ground it would hinder redevelopment.

*Gammoh* does not apply here. In *Gammoh,* the City of Anaheim was found to have used redevelopment as "a tool for a city to arbitrarily exclude adult businesses." (*Gammoh v. City of Anaheim, supra,* 73 Cal.App.4th at p. 199.) *Gammoh* held a city may not deny a permit based on a desire for redevelopment when the exercise of First Amendment rights is involved. As has been noted, Star has a permit to operate an adult business featuring nude entertainment. This case involves onsite consumption of alcohol which properly may be regulated based on anticipated future uses of the area.

### 6. *The APC's findings are supported by substantial evidence.*

Star contends the APC improperly denied issuance of the conditional use permit based on conjecture and surmise rather than substantial evidence. (*Reimel v. Alcoholic Bev. etc. App. Bd.* (1967) 255 Cal.App.2d 40, 45 [62 Cal.Rptr. 778].) Star notes that mere proximity to a school or a church is not, as a matter of law, good cause which will sustain denial of a license. (*Ibid.*) Star further contends the trial court's finding that "nearby residents opposed the application" is unsupported because there are no nearby residents and the

site, which is zoned M3-1, is surrounded by industrial uses. Also, the APC's concern about proximity to skid row and the county jail lacks any relevance in determining the impact Star's operation will have on the neighborhood.

Star additionally asserts there was no evidence to support the APC's finding "crime potential exists when you combine alcohol sales and testosterone." Star argues it is settled that topless entertainment is not contrary to public welfare and morals or a justification for limiting the service of alcoholic beverages. (*Boreta Enterprises, Inc. v. Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 103 [84 Cal.Rptr. 113, 465 P.2d 1].) Star maintains *Boreta* rejected the notion topless entertainment combined with the service of alcohol leads to "improper activities and socially deleterious consequences . . . ." (*Ibid.*) Star asserts that here, as in *Boreta*, there is "no evidence in the record which would permit us to conclude that the evils which the Department seeks to avoid are in fact related to the use of topless waitresses . . . ." (*Id.* at p. 104.)

Star argues the combination of alcohol and adult entertainment is inherent in the inclusion of "bar" in LAMC's definition of an "adult cabaret." Thus, the municipal code itself contemplates the onsite sale and consumption of alcohol at adult cabarets.[2]

Star concludes the APC's hearing and decision were "a search for *any* reason to deny the CUP for an adult business rather than a dispassionate examination of the evidence and an objective weighing of the factors bearing on a correct decision." (*Smith v. County of Los Angeles, supra*, 24 Cal.App.4th at pp. 1007–1008.) Star claims other aspects of the APC's ruling constitute "gibberish," citing the conclusion the community wanted "the area to move forward, and not move backward, and the sale of alcohol at the subject location will not promote forward movement." Thus, the APC's finding lacks substantial support and must be set aside.

Star's contention fails because the evidence offered at the hearing indicated approval of Star's application would have a negative impact on the character and integrity of the neighborhood. The owner of the mortuary and representatives of the Temple indicated issuance of the permit would adversely impact the ability of the mortuary and the Temple to conduct services in a dignified and respectful environment based on problems encountered with patrons of another bar in the area. Others expressed concern that issuance of the permit would place individuals attending functions at the Temple and the daycare facility at risk of drunk drivers.

---

[2] LAMC section 12.70, subdivision B.3 defines " 'Adult Cabaret' " as "[a] nightclub, bar, restaurant or similar establishment which regularly features live performances which are characterized by the exposure of 'specified anatomical areas' or by 'specified sexual activities . . .' . . . ." (Boldface omitted.)

■ Although a liquor license may not be denied solely based on proximity to a school (*Reimel v. Alcoholic Bev. etc. App. Bd., supra,* 255 Cal.App.2d at p. 45), such proximity is an appropriate factor to consider in determining whether to grant a permit (*Weiss v. State Board of Equalization* (1953) 40 Cal.2d 772 [256 P.2d 1] [proximity to a high school]; *Schaub's Inc. v. Dept. Alc. Bev. Control* (1957) 153 Cal.App.2d 858 [315 P.2d 459] [proximity to church providing youth services properly considered in denying offsite consumption license to a supermarket]).

Additionally, concern of neighbors is sufficient to constitute substantial evidence that a contemplated use is detrimental to the welfare of the community. (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 337 [25 Cal.Rptr.2d 842]; *Harris v. City of Costa Mesa* (1994) 25 Cal.App.4th 963 [31 Cal.Rptr.2d 1].) *Harris* noted " 'expert testimony on these issues is not necessary. It is appropriate and even necessary for the [agency] to consider the interest of neighboring property owners in reaching a decision whether to grant or deny a land use entitlement and the opinions of neighbors may constitute substantial evidence on this issue. [Citations.]' " (*Harris,* at p. 973.)

■ With respect to the APC's assertedly inappropriate correlation of alcohol, testosterone and inappropriate behavior, the case upon which Star places its primary reliance, *Boreta,* is distinguishable. *Boreta* addressed whether the ABC abused its discretion in revoking a liquor license based on the ABC's determination the "use of topless waitresses, in itself and without more, is conduct contrary to public *morals* and thus in itself constitutes grounds" for the revocation of a liquor license. (*Boreta Enterprises, Inc. v. Department of Alcoholic Beverage Control, supra,* 2 Cal.3d at p. 100.) *Boreta* held such a finding is an abuse of discretion unless the agency first considers and evaluates the effects of the course of conduct. (*Id.* at p. 99.) Thus, *Boreta* stands for the proposition it is improper to presume that service of alcohol combined with adult entertainment is inherently contrary to public welfare. (*Santa Ana Food Market, Inc. v. Alcoholic Beverage Control Appeals Bd.* (1999) 76 Cal.App.4th 570, 575 [90 Cal.Rptr.2d 523].)

Here, the APC did not make a per se finding that alcohol and testosterone do not mix. Rather, the APC based this conclusion on the testimony of Los Angeles Police Department officers who testified against granting the permit based on their experience with similar clubs. Addressing Star's argument the APC had based its ruling on speculation, the trial court stated: "This is from their observation; this is from their experience. The police officers' testimony . . . was extremely well supported here in this case. Given the many records I have read, this was very convincing here to me."

We agree with the trial court's assessment and conclude that substantial evidence supports the APC's ruling.

### 7. *The low crime rate does not mandate issuance of the permit.*

Star notes the APC found "the crime statistics are low for this area and the associated alcoholic beverage sales establishments are non-existent in the subject census tract . . . ."[3] Nonetheless, the APC "found that the proposed use will result in an undue concentration of premises for the sale or dispensing . . . of alcoholic beverages when the larger surrounding community, including . . . the downtown area, is taken into consideration. [¶] In this larger area, it has been demonstrated by verbal testimony from the Council office and the police department that there are troublesome issues involving the mixture of alcohol and a nightclub, or other cabaret like activities."

Star contends the APC's finding the crime rate in the area is low mandates a ruling in Star's favor. Star asserts there is no evidence to support the APC's finding that granting the application will result in "an undue concentration of premises for the sale or dispensing . . . of alcoholic beverages" giving consideration to the crime rate.

Star notes it was undisputed the area has a very low crime rate. The APC stated: "[C]rime is not currently a problem and [the] community can maintain that standard in part by the withholding of alcohol beverage permits when such could lead to neighborhood problems." Star concludes it was denied the conditional use permit because the crime rate was too low.

■ Problems at existing bars support denial of additional permits in the area. (*Weiss v. State Board of Equalization, supra,* 40 Cal.2d at p. 777 [permit denial upheld despite no other liquor licenses in the area based on proximity of residential area].)

■ Here, the testimony and evidence submitted to the APC was rationally related to preservation of the character and integrity of the neighborhood based on current conditions and problems experienced in the area. Thus, the evidence supports the APC's ruling and the trial court's denial of Star's writ petition.[4]

---

[3] The LAMC provides that, in order to grant a permit, the APC must find "the application will not result in an undue concentration of premises for the sale or dispensing for consideration of alcoholic beverages, . . . giving consideration to . . . the crime rate in the area . . . ." (LAMC, § 12.24, subd. W.1(a)(2).)

[4] The City argues the denial of Star's application may also be upheld on the ground that Star's onsite parking is inadequate in comparison to the capacity of the building. (See *Martin v. Alcoholic Bev. etc. Appeals Bd.* (1959) 52 Cal.2d 238, 247–248 [340 P.2d 1].) The City notes

## DISPOSITION

The order denying Star's petition for writ of administrative mandate is affirmed. The City shall recover costs on appeal.

Croskey, J., and Kitching, J., concurred.

---

the club has a maximum occupancy of 245 and a code maximum of 434 but parking for only 133 vehicles. However, the issue of adequate parking was not raised before the APC. This court may not affirm the APC's determination on a basis not embraced by the agency itself. (*Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1111 [102 Cal.Rptr.2d 684].)