Filed 7/15/13  Four Sided Properties v. City of Los Angeles CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| FOUR SIDED PROPERTIES, LLC,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CITY OF LOS ANGELES,<br><br>    Defendant and Appellant;<br><br>BRENTWOOD RESIDENTS COALITION et al.,<br><br>    Interveners and Appellants. | B238479<br><br>(Los Angeles County Super. Ct. No. BS128425) |

APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge.  Affirmed.

Carmen Trutanich, City Attorney, Terry P. Kaufmann Macias, Supervising Attorney, and Amy Brothers, Deputy City Attorney, for Defendant and Appellant City of Los Angeles.

Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg and Thomas R. Freeman for Interveners and Appellants Brentwood Residents Coalition and Brentwood Homeowners Association.

Jeffer Mangels Butler & Mitchell, Benjamin M. Reznik and Matthew D. Hinks for Plaintiff and Respondent Four Sided Properties, LLC.

Four Sided Properties, LLC (Four Sided) applied to the City of Los Angeles (City) for a conditional use permit allowing the on-site sale and consumption of alcoholic beverages (hereafter a CUB) in a planned restaurant to be opened in a commercial building located in Brentwood. A city zoning administrator issued a decision to approve the CUB subject to more than forty prescribed conditions. Then, the Brentwood Residents Coalition and the Brentwood Homeowners Association (hereafter the Intervenors) appealed the zoning administrator's decision to the West Los Angeles Area Planning Commission (APC), and the APC issued a decision granting the appeal and denying the CUB. Four Sided, in turn, filed a petition for writ of administrative mandate commanding the APC to set aside its decision denying the CUB. The trial court ruled that the findings in the APC's decision to deny the CUB failed to satisfy the analytic requirements of *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 (*Topanga*) and that its findings were not supported by substantial evidence. Judgment was entered in favor of Four Sided. The judgment did not command the City to issue the CUB to Four Sided because review under the California Environmental Quality Act or CEQA (Pub. Resources Code, § 21000 et seq.) was not completed. The City and the Intervenors appeal. We affirm.

## FACTS

### General Background

Four Sided owns a triangle-shaped parcel of real property fronting on San Vicente Boulevard on the north, Montana Avenue on the south, and a boundary line on the west running north-south between the two streets. The property is developed with a one-story commercial building of 8,465 square feet constructed about 1927. There are five parking spaces ancillary to the building. Four Sided has plans for a 3,900 square-foot restaurant within the greater building space. The space was previously used as a health and fitness gym for approximately 30 years. The planned restaurateur is Fig & Olive.[1] There are

---

[1]     Fig & Olive is not a party to the current CUB-related litigation or appeal. The dissent asserts this may mean Four Sided lacks standing. It does not. Four Sided owns the property and the CUB is transferrable to another restaurant because conditional use

residents in the area who oppose any restaurant in Four Sided's property; they complain that a restaurant will increase existing traffic, noise, and parking problems in the area. At the conclusion of earlier litigation, the City's Department of Building and Safety issued a building permit to Four Sided to build out the planned restaurant space in its property.[2]

In 2009, Four Sided applied for a CUB. Conditional use permits are regulated by section 12.24 of the Los Angeles Municipal Code.[3] Under section 12.24, a zoning administrator is the initial decision maker for an application for a conditional use permit, and the local area planning commission serves as the appellate body. (§ 12.24 I.2 and W.1.) Under section 12.24 E, the decision maker may not approve a conditional use permit of any kind without making four specified findings. These mandatory findings require consideration of the affirmative benefits and the absence of negative effects from the proposed use. The findings under section 12.24 E are: the proposed location will be desirable to the public convenience or welfare; the proposed location is proper in relation to adjacent uses or the development of the community; the proposed use will not be materially detrimental to the character of development in the immediate neighborhood,

permits run with the land. (*County of Imperial v. McDougal* (1977) 19 Cal.3d 505, 510.) Further, none of the parties have raised this issue, making it an improper basis for our decision. (See Gov. Code, § 68081.) Because Four Sided may want to put another restaurant on the property if Fig and Olive no longer wishes to build there, we cannot say the matter is moot. Moreover, we are not aware of any procedural mechanism by which we may remand the matter for a determination of mootness.

[2]     The predominant issue in the prior litigation was whether there were sufficient parking spaces ancillary to Four Sided's property to allow the building of a restaurant. A short summary of the prior litigation is set forth later in this opinion.

[3]     All further section references are to the Los Angeles Municipal Code unless otherwise specified.

3

and the proposed location will be in harmony with the various elements and objectives of the City's General Plan.[4]

In addition to the findings required for any conditional use permit, three additional findings are required under section 12.24 W for a CUB. These additional findings for a CUB require consideration of the absence of negative effects from the proposed alcohol-related use. They are: "(1) that the proposed use will not adversely affect the welfare of the pertinent community; [¶] (2) that the granting of the application will not result in an undue concentration of premises for the sale . . . of alcoholic beverages . . . in the area of the City involved, giving consideration to applicable State laws and to the California Department of Alcoholic Beverage Control's guidelines for undue concentration; and . . . the number and proximity of these establishments within a one thousand foot radius of the site, the crime rate in the area (especially those crimes involving public drunkenness, the illegal sale or use of narcotics, drugs or alcohol, disturbing the peace and disorderly conduct), and whether revocation or nuisance proceedings have been initiated for any use in the area; and [¶] (3) the proposed use will not detrimentally affect nearby residentially zoned communities in the area of the City involved, after giving consideration to the distance of the proposed use from residential buildings, churches, schools, hospitals, public playgrounds and other similar uses . . . ." (§ 12.24 W.1(a).) In sum, *seven* mandatory findings must be made for issuance of a CUB.

On appeal from the zoning administrator's decision, section 12.24 directs the appellate body to "make its decision, based on the record, as to whether the initial decision-maker erred or abused his or her discretion." (§ 12.24 I.3.) "For all appellate bodies, any resolution to approve must contain the same findings required to be made by the initial decision-maker, supported by facts in the record." (§ 12.24 I.5.)

---

[4]    These were the required findings at the time the decision was made in this case. Section 12.24 was amended by ordinance No. 182, 095, effective as of May 2012. The parties agree that review under former section 12.24 applies to this case.

4

*Approval by the Zoning Administrator*

In February 2010, the zoning administrator held a public hearing on Four Sided's application for a CUB, and received oral testimony and written materials from interested parties. Shortly thereafter, the zoning administrator issued a decision approving the CUB, including the mandatory findings required under subdivisions E and W of section 12.24. The CUB was subject to 43 conditions, including limiting the activities allowed on the premises and setting forth the configuration of alcohol distribution points within the planned restaurant.

In making her decision to issue a CUB, the zoning administrator did not consider the parking issues related to the planned restaurant because she believed it was outside of her purview. The issue of parking for the restaurant had been resolved in a previous writ petition filed by Four Sided.

In considering Four Sided's application for a CUB, the zoning administrator took into account the previous litigation, and then applied an analysis which examined the impacts resulting only from a restaurant with alcohol sales, as opposed to the operation of a restaurant without the sale of alcohol. The zoning administrator did not consider the impact the proposed alcohol-serving restaurant would have from a baseline of the existing empty use for the space.

### The APC Denies the CUB on Administrative Appeal

The Intervenors appealed the zoning administrator's determination to the APC. At a public hearing held on June 16, 2010, the APC heard from community groups and homeowners associations as well as residents in the area. Some supported the approval of the CUB, but most opposed it, arguing that lack of parking, increased traffic and noise made it undesirable.

The zoning administrator advised the APC that the issue of parking was not before the APC because Four Sided has "the code-required parking" for its planned restaurant. She further stated that "[a] restaurant can go in there at this time by right" and therefore, the APC should consider only the issues related to the CUB. One commissioner noted that the City Attorney had advised the APC that "parking is not an issue," but traffic

5

could be considered, as could the impacts of having an additional establishment that serves alcohol.

Despite the zoning administrator's statements, and the advice of the City Attorney, both increased traffic and parking were subjects of considerable discussion at the CUB hearing. The APC heard testimony and considered evidence from local residents who were concerned about the noise and safety associated with a valet route designed to travel through a residential neighborhood. The Los Angeles Police Department also submitted a letter opposing the CUB "[d]ue to an over-concentration of alcohol licenses in the area."

In a Mitigated Negative Declaration (MND) created under CEQA guidelines by the City Planning Department in 2009, the planning department did not anticipate significant traffic or parking impacts since the required parking was to be provided off-site. These conclusions were echoed in an initial study and assessment of the traffic impacts for the project created by the Planning Department in 2010. In that assessment, the planning department estimated that the restaurant would generate an additional 358 daily trips, attributing 496 daily trips to the restaurant and 138 trips to the gym that previously occupied the space. The planning department concluded that there would be a "less than significant impact" on the existing traffic load and capacity of the street system as well as any existing traffic hazards. The planning department also concluded that the project would have a less than significant impact on the level of service standards established by the county congestion management agency for the designated roads.

The MND was criticized by David Shender, a traffic engineer hired by the project's opponents. Shender found the MND and the traffic assessment to be deficient because it failed to adequately count the number of valet trips it would take to service a restaurant with a CUB. In a memorandum to the APC critiquing the City's MND, Shender noted the MND failed to take into account how the off-site parking proposed by Four Sided would displace current parking needs and force many more cars to search for parking on nearby streets. He also criticized the MND for failing to provide "a residential street segment impact analysis typically prepared by LADOT associated with

6

the transporting of vehicles between the off-site parking and the restaurant by valet attendants.  Had the analysis been prepared, it likely would have determined a significant impact due to the project on local residential streets based on LADOT's adopted thresholds of significance used in CEQA-related traffic evaluations . . .  [¶]  . . . Further, the condition of approval by the ZA for an on-site valet station is in conflict with LATDOT's prior determination that a valet station cannot be provided on-site."  Shender opined at the APC hearing that "restaurants that have a beverage permit generate more traffic [and] parking than restaurants that do not."

A traffic engineer, Arthur Kassan, submitted a traffic analysis on behalf of Four Sided.  Kassan also testified at the public hearing that the traffic analysis created by Shender was based on a "high-turnover restaurant like a Souplantation or Denny's or Coco's," not a "quality restaurant" such as Fig & Olive was intended to be.[5]  Instead, the traffic study submitted by the Department of Transportation was valid and conducted in accordance with applicable standards.  He stated it was also reviewed by a high level LADOT engineer, who concluded that the MND was valid.

At the conclusion of the hearing, the commissioners of the APC indicated they would grant the appeal and overturn the zoning administrator's decision to approve Four Sided's CUB application.  In a written determination mailed July 20, 2010, the APC advised that it granted the Intervenor's appeal, overturned the zoning administrator's decision and denied the CUB.  The written determination's seven mandatory findings under section 12.24 are reviewed below in more detail in addressing the appeal by the City and the Intervenors.

---

[5]  It's not clear to this court, based on our review of the administrative record, that a traffic "analysis" – of the nature the term might be normally be understood – was ever submitted by the opponents of Four Sided's application for a CUB.  Kassan's comment about a traffic analysis by the opponents may have been about the opponents generalized concerns as to traffic.  A traffic expert who worked with the opponents made comments to the effect that a traffic study might be appropriate.

*The Writ Petition Challenging the APC's Decision to Deny the CUB*

In September 2010, Four Sided filed a petition for writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5, praying for a writ commanding the APC to set aside its decision denying the CUB. The trial court granted the Intervenors' motion to participate in the writ proceeding.

The parties argued the cause to the trial court in April 2011, and the court entered a minute order granting Four Sided's writ petition. Shortly thereafter, the court issued a written decision granting the petition. In its decision granting the petition, the court specifically addressed each of the APC's seven required findings, and found each to be deficient, either for lack of substantial evidence or under the requirements of *Topanga*, or both. As explained in the court's conclusion, the APC's findings "[i]n large part" did not satisfy the *Topanga* requirement that an administrative agency's decision "bridge the analytical gap between the raw evidence and the conclusions reached by the [agency]." The court further found the APC's findings were not supported by substantial evidence in the record in that: "While there is evidence in the record of community opposition to any kind of restaurant, that is not the issue. [A] restaurant is permitted. The only legitimate zoning issues concerned whether a CUB should be permitted."

In November 2011, the trial court entered judgment that a writ would issue commanding the APC to set aside the determination to deny Four Sided's application for a CUB. By express provision, the judgment did not command the City to issue the CUB in that review under CEQA (Pub. Resources Code, § 21000 et seq.) was not completed.

The City and the Interveners filed timely notices of appeal from the judgment.

## DISCUSSION

The City and the Interveners contend the judgment must be reversed because all seven of the APC's mandatory findings under section 12.24 satisfied *Topanga*, and all seven mandatory findings are supported by substantial evidence.[6] We disagree.

---

[6] Four Sided's respondent's brief is 310 words. In short, Four Sided contends that the appeals filed by the Interveners and the City, including the proceedings leading up to

8

**I.     Standard of Review**

"The exclusive remedy for judicial review of administrative action affecting land use is a proceeding under Code of Civil Procedure section 1094.5."  (*SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 468 (*SP Star*); *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1211; see § 1094.5, subd. (a).)

The California Supreme Court set forth the relevant standard of review in the seminal case of *Topanga*: "Section 1094.5 clearly contemplates that at [a] minimum, the reviewing court must determine both whether substantial evidence supports the administrative agency's findings and whether the findings support the agency's decision. Subdivision (b) of section 1094.5 prescribes that when petitioned for writ of mandamus, a court's inquiry should extend, among other issues, to whether 'there was any prejudicial abuse of discretion.'  Subdivision (b) then defines 'abuse of discretion' to include instances in which the administrative order or decision 'is not supported by the findings, *or* the findings are not supported by the evidence.' . . .  Subdivision (c) declares that '*in all . . . cases*' other than those in which the reviewing court is authorized by law to judge the evidence independently, 'abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in light of the whole record.'  [Citation.]  [¶]  We further conclude that implicit in section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order.  If the Legislature had desired otherwise, it could have declared as a possible basis for issuing mandamus the absence of substantial evidence to support the administrative agency's action.  By focusing, instead, upon the relationships between evidence and findings and between findings and ultimate action, the Legislature sought to direct the reviewing court's attention to the analytic route the administrative agency traveled from evidence to action.  In so doing, we believe that the Legislature must have contemplated that the agency would reveal this route."  (*Topanga, supra,* 11 Cal.3d at pp. 514-515, fn. omitted.)

the previous writ petition on the parking issue, have driven up the costs of the project to such a degree that it lacks the financial ability to respond substantively to the appeal.

The California Supreme Court found this requirement to be based upon United States Supreme Court precedent which indicated "the 'accepted ideal . . . is that "the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.' (*S.E.C. v. Chenery Corp.* (1943) 318 U.S. 80, 94.)' [Citations.]" (*Topanga*, 11 Cal.3d at p. 516.)

The Intervenors urge us to resolve the issue of whether local agencies that are considering the impacts from the issuance of a CUB must measure such impacts against a baseline of the existing environmental conditions or against the maximum allowable use of the property. The Intervenors urge us to hold that a local agency must use the existing conditions standard to evaluate a CUB. As we understand the record, the location currently stands empty. If we were to adopt the Intervenors' "existing conditions" standard, the City would measure the potentially adverse impacts of the project against a baseline of the existing use, which is no restaurant or any other tenant.

We are constrained from employing the standard suggested by the Intervenors given the litigation history of this case. Instead, we agree with the zoning administrator and the court: the issue of whether a restaurant may operate in that space has been litigated and resolved. As part of its building permit application to locate a restaurant on the property in 2008, Four Sided's right to provide only five parking spaces was "grandfathered" in and approved by the City's Department of Building and Safety. An appeal ensued, and the APC overturned the Department of Building and Safety's decision to issue the building permit. Four Sided filed a petition for writ of mandamus. At about the same time, Four Sided recorded a covenant with the City which provided off-site parking for its planned restaurant and satisfied all parking requirements. The trial court granted Four Sided's writ petition in August 2010, finding the APC's determination was not supported by the evidence. The Department of Building and Safety reinstated the building permit, giving Four Sided the right to put a restaurant on its property.

Four Sided applied for a CUB; this case involves only the denial of that CUB. Our review is limited to that issue. (*Clark v. Lesher* (1956) 46 Cal.2d 874, 880 [prior judgment " 'operates as an estoppels or conclusive adjudication as to such issues in the

10

second action as were actually litigated and determined in the first action' "].)
Considering the existing conditions *and* the propriety of a CUB here would essentially
entitle the Intervenors and the City to relitigate the issue of whether a restaurant (with or
without alcohol service) may operate in that space. We therefore decline to re-examine
the propriety of a conditional use permit for a restaurant.

## II.    Applicable Case Law

We find two cases we have already discussed instructive: *Topanga* and *SP Star*.
In *Topanga*, a property developer applied for a variance to build a mobile home park in
an area zoned for agriculture and single family residences on minimum one-acre lots.
(*Topanga, supra,* 11 Cal.3d at p. 510.) The Supreme Court concluded that the planning
commission's summary of "findings" did not support the variance requirements. (*Id.* at
p. 518.)

Specifically, the California Supreme Court determined that the commission failed
to satisfy the variance requirements contained in Government Code section 65906, which
permits variances " 'only when, because of special circumstances applicable to the
property, . . . the strict application of the zoning ordinance deprives such property of
privileges enjoyed by other property in the vicinity and under identical zoning
classification.' " (*Topanga, supra,* 11 Cal.3d at p. 520.) In *Topanga*, the evidence relied
upon by the planning commission merely described the proposed development, the
terrain in the area, and efforts to leave 30 percent of the acreage in its natural state. The
commission reported that development would help satisfy a growing demand for low cost
housing in the area and attract further investment. Conventional residential development
in line with the zoning requirements was not attractive because the hilly terrain required
costly grading and filling.

The court determined that this "data" focused almost exclusively on the qualities
of the property in question, but failed to provide comparative information on surrounding
properties as required under the Government Code. Thus, the information relied upon by
the commission related "not at all on the critical issue whether a variance was necessary
to bring the original real party in interest into substantial parity with other parties holding

11

property interests in the zone." (*Topanga, supra,* 11 Cal.3d at pp. 520-521.) There was no information regarding the other tracts in the area and how they differed from the one seeking a variance. (*Id.* at p. 521.)

*SP Star* provides insight to how the *Topanga* requirements apply to a CUB application under the Los Angeles Municipal Code. In *SP Star*, a certificate of occupancy permitting fully nude entertainment was granted to an adult club. The club then sought a CUB to serve alcohol pursuant to section 12.24. The zoning administrator conditionally granted the application for one year because there were no alcohol licenses for that tract and the crime rate was low.

A nearby Buddhist temple and a mortuary appealed the zoning administrator's approval decision to the area planning commission. The appeal was supported by the Los Angeles Police Department, two city council members, the Central City East Association and numerous private citizens. The commission heard testimony from the mortuary owner that the club was approximately three blocks from the mortuary, where more than 500 funerals and memorials are conducted each year. Many of these services continue into the night as is the Japanese-American custom. There was already a problem with patrons of a bar across the streets, who were loud and disrespectful, often urinating in the mortuary's parking lot. He feared an additional alcohol license granted to the club would cause further disruption to the services. (*SP Star, supra,* 173 Cal.App.4th at p. 463.)

The commission also heard testimony that the permit would create an unsafe environment for the families who attended the temple and for the children who used the temple's daycare center. The children, in particular, would likely come in contact with the club's patrons when they were dropped off from monthly field trips. The temple also provided funeral services, memorial services and weddings, most of which take place in the evenings. Representatives from two city council members expressed concern about an increase in drunk driving in the neighboring residential communities and testified the area was undergoing revitalization to bring more residences and light industrial uses into the area. Further, the alcohol permit was not compatible with the council's vision for the area. Nearby business owners also opposed the application, fearing it would cause

12

increased noise and drunkenness in the evenings and on the weekend.  The Los Angeles Police Department indicated that alcohol combined with this type of establishment and late hours would increase the crime rate just as the area was undergoing a resurgence. (*SP Star, supra,* 173 Cal.App.4th at p. 465.)

The commission found that the proposed use was not desirable to the public convenience or welfare, was materially detrimental to the character of development of the community, and was not in harmony with the objectives of the general plan.  (*SP Star, supra,* 173 Cal.App.4th at pp. 466-467.)  It further found that "[i]t is not respectful of what is referred to as sacred space; associated with both the nearby Buddhist temple, and with the mortuary.  And it provides a potentially dangerous mixture of the sale of alcoholic beverages and [an] otherwise permitted use of land that, in the opinion of the Los Angeles Police Department, can result in increased crime rates." (*Id.* at p. 467.) The appeal was granted and the club filed a petition for administrative mandamus in the trial court, which was denied.

Division Three of our court affirmed the trial court's judgment, ruling that the "concern of neighbors is sufficient to constitute substantial evidence that a contemplated use is detrimental to the welfare of the community." (*SP Star, supra,* 173 Cal.App.4th at p. 476.)  Further, testimony from the mortuary owner and the members of the temple showed that approval of the CUB would have a negative impact on the character and integrity of the neighborhood.  The court was also persuaded by the police officer's testimony regarding their experience of increased crime in connection with similar clubs. The court concluded that substantial evidence supported the commission's ruling.  (*Ibid.*)

III.    **The APC's Findings as to Four Sided**

Guided by *Topanga* and *SP Star,* we review the administrative record to determine whether the APC's decision provided the requisite "analytic bridge" between its decision and the raw evidence, and whether "there was any prejudicial abuse of discretion" in the administrative decision because it "is not supported by the findings, *or* the findings are not supported by the evidence." (*Topanga, supra*, 11 Cal.3d at p. 515.) Because section 12.24 I.5 required the APC, like the zoning administrator, to make seven

13

required findings to approve Four Sided's application for a CUB, we must conclude that the APC properly denied the CUB even if one of the APC's findings is proper under the law and is supported by substantial evidence. With this framework in mind, we address each of the APC's seven findings.

### 1. Public Convenience or Welfare

The APC's decision reads: "At the appeal hearing the [APC] took testimony from area residents as well as an attorney and a traffic engineer hired by the project opponents. The . . . APC determined that there are too many restaurants in the subject area that serve alcohol, and that this instant request may be one too many. [The APC] concluded that restaurants that serve alcohol result in more vehicular trips than ones that do not which result in an increase in traffic. [A]s such, the proposed location will not be desirable to the public convenience or welfare."

The trial court ruled this finding did not satisfy *Topanga*'s requirements and we agree. While a zoning agency's findings " 'need not be stated with the formality required in judicial proceedings' " (*Topanga, supra*, 11 Cal.3d at p. 517, fn. 16), there must be at least enough explanation of the connection between the evidence and finding to allow the parties and any reviewing court to determine whether, and on what basis, to review the agency's finding. (*Id*. at pp. 514-515.) The APC's finding here did not make reference to the evidence showing that Four Sided's restaurant would be "one too many" that served alcohol. The APC did not guide us, as the reviewing court, "to the analytic route the administrative agency traveled from evidence to action." The APC's finding did not make reference to the evidence showing that Four Sided's alcohol-serving restaurant would "result in an increase in traffic" over one that did not serve alcohol. In short, the APC's finding is a conclusion in want of a reference to supporting evidence. The APC abused its discretion

The APC's failure to satisfy *Topanga*'s evidence-to-findings analytic requirements is not a mere technical, formulaic omission. Had the APC done its job, Four Sided may have been in a position to decide not to expend the time, effort and costs associated with filing a petition for writ of administrative mandate challenging the APC's decision. And

14

the trial court may have been spared the time and effort, and expenditure from the public fisc in adjudicating a writ petition. Most importantly, had the APC worked through the task of making the analytic bridge between the evidence and its findings, by identifying the evidence in support of the findings it wanted to make, it may have come to the conclusion that the evidence simply did not support its findings.

The trial court also determined this finding was not supported by substantial evidence. While this might be true, we are hard pressed to address the substantial evidence issue. Because the APC's finding fails to explain the evidence upon which it relied in reaching its finding in violation of *Topanga*, the task of reviewing whether substantial evidence supports it is nearly impossible. We do not know what evidence the APC relied on, what evidence it rejected, what weight it placed on the evidence it did consider or any reason for making those choices.

### 2. Proper in Relation to Adjacent Uses or the Development of the Community

The APC's decision reads: "Adjacent properties include office, retail, a pharmacy and parking to the north across San Vicente Boulevard . . . , parking, office uses, and a gas station to the east . . . , multi-family residences to the south across Montana Avenue . . . , and parking, retail, restaurant uses . . . as well as multi-family residences across the alley to the west . . . . The . . . APC determined that the proposed location is not proper for the service of alcohol incidental to food because of the proximity to residential uses."

The trial court ruled this finding did not satisfy *Topanga*'s requirements and, again, we agree. The APC's finding here did not make reference to the evidence showing that Four Sided's restaurant would "not be proper" in relation to adjacent uses. The APC's finding did no more than state that Four Sided's restaurant would be adjacent to other uses. The required finding under section 12.24 E is not mere proximity; the required finding is that the proposed use would not be proper in relation to adjacent uses. Again, the APC's finding is a conclusion that lacks reference to supporting evidence.

15

Given that Fig and Olive would be placed in an area that already has restaurants that serve alcohol, we can see why it would be a difficult analytical bridge to cross.

### 3. Materially Detrimental to the Character of the Neighborhood

The APC's decision reads: "Evidence was presented in the administrative record (both written and verbal) that the service of alcohol at the proposed restaurant will be materially detrimental to the character and development of the Brentwood neighborhood. The . . . APC found that Brentwood is not similar to neighborhoods downtown. The proposed service of alcohol on the patio will increase noise levels and be disruptive to nearby residential uses. The . . . APC also found that the use of valet parking will result in cut-through traffic which will affect residential uses."

Once more, we side with the trial court and determine this finding did not satisfy *Topanga*'s requirements. The abstract statement that "evidence was presented" is of no assistance either to a party or a court examining whether a finding was supported by particular evidence. The trial court's determination that there is no substantial evidence in the administrative record to show that noise at Four Sided's restaurant from serving food on the patio with alcoholic beverages would be materially different from serving food without alcoholic beverages is also well taken. In addition, the APC's reference to valet parking and "cut-through" traffic was simply not relevant to the issues involved in the CUB application context without evidence that these issues were affected by serving alcohol at the planned restaurant.

### 4. Harmony with the General Plan

The APC's decision reads: "The Brentwood-Pacific Palisades Community Plan Map designates the property for Community Commercial land uses . . . . The property is located within the San Vicente Scenic Corridor Specific Plan. . . . The property, however, is not located in an area subject to an Interim Control Ordinance."

This finding did not satisfy *Topanga*'s requirements. The APC's finding does nothing more than state that the property is located within an area with certain zoning designations. There is no explanation as to how the property is not in harmony with the General Plan; there is no evidence referenced or discussed as to the lack of harmony with

16

the General Plan. This is exactly the type of finding the California Supreme Court has indicated is inadequate.

### 5. Adversely Affect the Welfare of the Pertinent Community

The APC's decision reads: "The . . . APC found based on testimony and evidence presented that the sale of alcoholic beverages at the proposed restaurant will adversely affect the welfare of the Brentwood community due to an increase in noise and traffic." This is the entirety of its finding.

We are quite certain the trial court appropriately ruled this finding did not satisfy *Topanga*'s requirements. The APC's finding does not reference or discuss any evidence. Merely stating that "testimony and evidence was presented" sheds no light on the evidence in support of the APC's finding. Here, the APC wholly failed to bridge the analytic gap between the evidence and its finding. The APC's finding provided no guidance at all as to how it reached its conclusion. This finding does nothing more than state a conclusion.

### 6. Undue Concentration of Premises for the Sale or Dispensing of Alcoholic Beverages

The APC's decision reads: "The applicant will be applying for a Type 47 License (On-Sale General for Bona Fide Public Eating Place) from the State Department of Alcoholic Beverage Control (ABC). According to the ABC, there are 14 active existing licenses within Census Tract No. 2643.02, three of which are Type 47 Licenses. The remainder include one Type 51 (On-Sale Club, members & guests only), seven Type 41 (On-Sale Beer & Wine for Bona Fide Public Eating Place), and three Type 21 (Off-Sale General Store). The [ABC] has allotted a total of 9 licenses to this tract, including five on-site and four off-site licenses to this tract. The . . . APC determined that the addition of one [more] liquor license will result in an undue concentration in Brentwood. The proposed restaurant is the type that would be a destination restaurant for residents of the City as well as visitors. People will likely be driving to the restaurant and that could result in an increase in accidents and drunk driving. [¶] Statistics from the Los Angeles Police Department reveal that in the subject Crime Reporting District No. 831, which has

17

jurisdiction over the subject property, a total of 191 crimes were reported [in 2008], including 131 Part I crimes (89 of which were for larceny), and 60 Part II crimes . . . , compared to the citywide average of 235 crimes for the same period. LAPD recommended denial of the conditional use permit based on the over-concentration of licenses and the community's opposition. The . . . APC noted that they have never seen such opposition to a conditional use permit from LAPD and found that to be compelling evidence for the denial."

Under section 12.24 W.1(a)(2), the following finding is required for a CUB: "the granting of the application will not result in an undue concentration of premises for the sale . . . of alcoholic beverages . . . in the area of the City involved, giving consideration to applicable State laws and to the [ABC]'s guidelines for undue concentration; and . . . the number and proximity of these establishments within a one thousand foot radius of the site, the crime rate in the area (especially those crimes involving public drunkenness, the illegal sale or use of narcotics, drugs or alcohol, disturbing the peace and disorderly conduct), and whether revocation or nuisance proceedings have been initiated for any use in the area."

The trial court determined this finding did not satisfy *Topanga's* requirements in that the APC did "not evaluat[e] all of the necessary factors" under section 12.24 W.1.(a)(2). We agree. The APC failed to consider the relevant facts regarding the crime rate in the area. There is no indication it considered "crimes involving public drunkenness, the illegal sale or use or narcotics, drugs or alcohol, disturbing the peace and disorderly conduct" as is mandated. There is no indication the APC considered whether revocation of nuisance proceedings have been initiated for use in the area. This failure demonstrates an abuse of discretion under the authorities we have cited. That it is a prejudicial abuse is implicit – there was not sufficient evidence for the decision and Four Sided would be precluded from receiving a CUB as a result. This alone is a sufficient basis for reversing the APC's finding.

18

Nonetheless, we also consider whether substantial evidence supports the APC's finding. The trial court found the evidence did not support the APC's "undue concentration" finding because the "assertions" of the LAPD and neighbors against the planned restaurant were "not enough" to support the finding. We agree. Section 12.24 W.1(a)(2) is addressed to the problem of an "undue concentration" of alcohol-related premises in an area, not simply a "concentration" of such premises. "Undue" must have some meaning, connoting a problem from the concentration of alcohol-related premises in the area near Four Sided's property. That there exist 14 alcohol licenses in an area intended to have nine licenses is not, by itself, substantial evidence of an "undue" concentration where there is no evidence that it causes any problems. Instead, the evidence shows that the crime rate in the area is lower than the citywide average. As we have noted, there is a lack of evidence of alcohol-related crimes, drug crimes and disorderly crimes as is required in section 12.24 W.1(a)(2). Similarly, there was no evidence of revocations or nuisance proceedings as required in that section. As did the trial court, we see no evidence in the administrative record supporting the finding that there is any problem associated with the concentration of alcohol-related businesses in the area, and that there will be a problem associated with such concentration from adding one more restaurant that serves alcohol with meals at the site of Four Sided's property. Finally, we see no nexus between the considerable objections from the area residents based on traffic, noise and parking concerns, and how those problems would be affected by a restaurant serving alcohol with meals rather than a restaurant that did not serve alcohol.

### 7. Detrimental Effect on Nearby Residentially Zone Communities

The APC's decision reads: "The following sensitive uses are located within a 1,000-foot radius of the project site: [nine facilities are listed, including a public library, magnet school, church and YMCA]."

We find, as did the trial court, that this finding did not satisfy *Topanga*'s requirements. Simply listing the "sensitive" facilities that are located within a 1,000-foot radius from a proposed use does not explain how there is evidence that the proposed use

may detrimentally effect those facilities.  This case is unlike *SP Star* where the service of alcohol at a fully nude adult club would exacerbate an already existing problem from its patrons who were loud and disrespectful, and urinated in nearby parking lots.  This is not a use of property that is disrespectful of sacred space like a temple conducting funeral and weddings.

## DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.


BIGELOW, P. J.

I concur:


FLIER, J.

20

**RUBIN, J. Dissenting:**

I respectfully and briefly dissent from the majority opinion, having concluded that an issue unrelated to the merits of the case should govern our decision.  I express my concern that decisions apparently made by the proponents of the project, perhaps affected by the passage of time, may have made this litigation moot.

We know from recent United Supreme Court jurisprudence that certain principles limit the power of courts to rule on issues otherwise before it.  One of these limits is found in the rule of standing.  "[C]ourts have authority under the Constitution to answer such questions only if necessary to do so in the course of deciding an actual 'case' or 'controversy.'  As used in the Constitution, those words do not include every sort of dispute, but only those 'historically viewed as capable of resolution through the judicial process.'  [Citation.]  This is an essential limit on our power: It ensures that we act as judges, and do not engage in policymaking properly left to elected representatives."  (*Hollingsworth v. Perry* (June 26, 2013) ___ U.S.___; ___ S.Ct. ___, 2013 WL 3196927, italics omitted.)

The rule of mootness is another principle that ensures that courts do not decide cases involving disputes not then ripe for adjudication.

" 'California courts will decide only justiciable controversies.  [Citations.]  The concept of justiciability is a tenet of common law jurisprudence and embodies" [t]he principle that courts will not entertain an action which is not founded on an actual controversy. . . ."  [Citations.]  Justiciability thus "involves the intertwined criteria of ripeness and standing.  A controversy is 'ripe' when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made."  [Citation.]  But "ripeness is not a static state" [citation], and a case that presents a true controversy at its inception becomes moot " 'if before decision it has, through act of the parties or other cause, occurring after the commencement of the action,

lost that essential character.' " ' (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1573.)" (*Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 174.)

Applying these principles here I have a serious doubt that this case is still ripe for adjudication. Respondent filed a responsive brief in which it decided not to address the arguments made by appellants or intervenors. Although respondent baldly stated the trial court's decision was correct, it also told us that "the litigation and opposition tactics of Appellants have driven up the costs of the project to such a degree that [respondent] does not have the financial ability to respond substantively to the arguments of Appellants." From that, the inference is clear to me that respondent is not going forward with the Fig and Olive project.

At oral argument, respondent's counsel was even more candid, telling the court that it was "quite possible," "may even be likely" that this project will never happen. Although not acknowledging the litigation was moot, counsel stated that it might become moot in the future. He also stated that a new restaurant could not make use of the current CUB permit because it would be a different applicant. (Counsel said that he believed Fig and Olive, the restaurant tenant, not respondent, was the applicant.)

The uncertainty about the project, the concession that respondent is no longer able to fund the litigation, and the suggestion that Fig and Olive has moved on convince me that there is a genuine question about whether the writ of mandate issued by the trial court, not yet final because of this appeal, is moot. Although appellate courts have the power to declare an appeal moot (*Lockaway Storage v. County of Alameda, supra*, 216 Cal.App.4th at p. 175), the record is not so fully developed that I can say with certainty that the appeal is moot. And I acknowledge that none of the parties has taken the position that the appeal is moot; at most, respondent has acknowledged that the case may become moot sometime. Rather than deciding a case which may no longer be legally justiciable, I believe prudence dictates that we return the case to the trial court to conduct a hearing with an evidentiary showing so that the trial court can determine whether the

2

administrative proceedings are or are not moot.  I would reverse and remand for that purpose.

RUBIN, J.